# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRY ALUISI,<br><br>          Plaintiff,<br>   v.<br><br>ELLIOTT MANUFACTURING CO.,<br>INC. PLAN, et al.,<br><br>          Defendants. | 1:04-CV-5373 AWI SMS<br><br>**ORDER DENYING PLAINTIFF'S REQUEST THAT THE COURT CONSIDER TESTIMONY OUTSIDE THE RECORD**<br><br>**(Document #111)** |

## BACKGROUND

In this action Plaintiff requests that the court review Defendant's denial of long term disability benefits pursuant to ERISA. The second amended complaint alleges that Unum Life Insurance Company of America ("Unum"), on behalf of Defendant Elliott Manufacturing Co., Inc. as the ERISA Plan and the ERISA Plan Administrator ("Elliott"), improperly denied Plaintiff's long term disability benefits under ERISA.

On March 5, 2009, the court issued its ruling concerning Plaintiff's request that the court consider evidence outside the record. The court ruled as follows:

> The court finds that if Unum's investigation was so minimal that it never followed up with questions to Plaintiff's treating physicians, Plaintiff's evidence of what his treating physicians would have told Unum if properly asked may be relevant to show a conflict of interest. The court may admit extrinsic evidence "when the irregularities have prevented full development of the administrative record. In that way the court may, in essence, recreate what the administrative record would have been had the procedure been correct."
> . . . .

Based on this authority, the court finds that the proposed testimony of Plaintiff's treating physicians is admissible *if* the administrative record was not fully developed. Plaintiff must first show from the administrative record that there was no "meaningful dialogue" with Plaintiff and/or Unum did not seek further information from Plaintiff's treating physicians and relied only on their brief and vague records. Evidence outside the record may only be considered to show an abuse of discretion, and it is not admissible to show whether Defendant properly denied the benefits. Thus, Plaintiff may not provide evidence from his treating physicians unless Plaintiff provides an offer of proof from the administrative record showing how the record was not fully developed.

On March 13, 2009, Plaintiff filed a brief on Unum's improper investigation. On March 30, 2009, Defendant filed a response to Plaintiff's brief alleging an improper investigation. The court heard oral arguments on April 6, 2009, at 1:30 p.m.

## LEGAL STANDARD

The general rule is that "when applying an abuse of discretion standard to an ERISA plan, the district court's review is limited to the administrative record." Burke v. Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016, 1027-28 (9th Cir. 2008); Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 970 (9th Cir. 2006). However, the court may consider evidence outside the administrative record "to decide the nature, extent and effect on the decision-making process of any conflict of interest " Nolan v. Heald College, 551 F.3d 1148, 1153 (9th Cir. 2009); Burke, 544 F.3d 1028; Abatie, 458 F.3d at 970. "Similarly, the district court may consider evidence outside the administrative record if it determines that procedural irregularities prevented the full development of the administrative record." Burke, 544 F.3d at 1028; Abatie, 458 F.3d at 970. The court may recreate what the administrative record would have been had the procedure been correct. Abatie, 458 F.3d at 972-73.

The Abatie court found as follows:

> When a plan administrator has failed to follow a procedural requirement of ERISA, the court may have to consider evidence outside the administrative record. For example, if the administrator did not provide a full and fair hearing, as required by ERISA, 29 U.S.C. § 1133(2), the court must be in a position to assess the effect of that failure and, before it can do so, must permit the participant to present additional evidence. We follow the Sixth Circuit in holding that, when an administrator has engaged in a procedural irregularity that has affected the administrative review, the district court should "reconsider [the denial of benefits]

2

> after [the plan participant] has been given the opportunity to submit additional evidence."
> As we noted earlier, if the plan administrator's procedural defalcations are flagrant, de novo review applies. And as we also noted, when de novo review applies, the court is not limited to the administrative record and may take additional evidence.
> Even when procedural irregularities are smaller, though, and abuse of discretion review applies, the court may take additional evidence when the irregularities have prevented full development of the administrative record. In that way the court may, in essence, recreate what the administrative record would have been had the procedure been correct.

Abatie, 458 F.3d at 973-73 (internal cites omitted).

The Ninth Circuit has implied that the failure to conduct a thorough investigation can be a procedural irregularity. See Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan, 349 F.3d 1098, 1112 (9th Cir. 2003).

## DISCUSSION

At issue is whether Unum's investigation was not complete. Such a finding would allow the court to consider Plaintiff's testimony and his treating physicians' testimony on what they would have told Unum if Unum had done a thorough investigation. There is no expressed legal standard for the court to apply to determine what evidence outside the record the court should consider under Abatie and its progeny. In general the Ninth Circuit has required a "meaningful dialogue" between claims administrators and beneficiaries. Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 870 (9th Cir. 2008); Booton v. Lockheed Med. Benefit Plan, 110 F.3d 1461, 1463 (9th Cir.1997). ERISA requires the plan to give a beneficiary a description of any additional material or information that is necessary for the beneficiary to "perfect the claim," and to do so in a manner calculated to be understood by the claimant. 29 C.F.R. § 2560.503-1(g).

In Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863 (9th Cir. 2008), the Ninth Circuit reiterated a plan's duty to have a meaningful dialogue with its beneficiary in deciding whether to grant or deny benefits. Id. at 873. The Ninth Circuit determined that the plan's communications with the plaintiff and her doctors were "hardly a model of clarity." The

3

Ninth Circuit found the plan's conclusion that the plaintiff's file "lacks clear, sequential, detailed, objective clinical information which would completely preclude Ms. Saffon from an attempt at return to work" was "little more than a long series of unconnected adjectives." Id. at 870.  The Ninth Circuit concluded that the plan disregarded its responsibility to have a meaningful dialogue by communicating directly with the plaintiff's doctors without advising the plaintiff of the communication.   For example, the plan's letter to the treating doctor gave him 10 days to respond if he disagreed with a reviewing doctor's report, but this report was not sent to the plaintiff.  Id. 873 n.3  The doctor missed the 10-day deadline and, because the plaintiff was not notified, she was not in a position to urge the doctor to timely respond or ask that the plan extend the deadline.  Id.    The Ninth Circuit recognized a: "A doctor is not a lawyer; though he may provide information that is relevant to a claimant's disability, his actions (or inaction) cannot bind the client.   If a claims administrator communicates with a doctor who has treated a beneficiary, it must disclose that fact to the patient at a meaningful time."  Id.   In addition, the plan took various doctors' statements out of context or otherwise distorted them in an apparent effort to support a denial of benefits.  Id. at 873.

In Silver v. Executive Car Leasing Long-Term Disability Plan, 466 F.3d 727 (9th Cir. 2006), the plan's final decision denying the plaintiff's claim relied for the first time on a report by a vocational expert who had based his opinion on the plaintiff's medical records. Id. at 732. When the plaintiff alleged she should have had the opportunity to respond to the plan's expert, the Ninth Circuit court concluded it was not procedural error for the defendant to fail to provide this information to the plaintiff.  The court reasoned that it would "lead to an interminable back-and-forth between the plan administrator and the claimant" if the plan had to disclose the vocational expert report prior to its final decision because disclosure would prompt a response from the employee, which would, in turn, require more evaluation.  Id. The Ninth Circuit also noted the defendant satisfied ERISA's requirement of full and fair review with respect to the vocational expert's report because the plaintiff had "enough information to prepare adequately for

1 . . . an appeal to the federal courts" without disclosure of the report. Id.

In Jordan v. Northrop Grumman Corp. Wel-Fare Benefit Plan, 3701, F.3d 869 (9th Cir. 2004[1], the plaintiff claimed total disability based on her fibromyalgia. Id. at 872-73. The plan asked her three treating doctors for narrative reports speaking, among other things, to her prognosis regarding returning to work. Id. at 873. Initially, none of the plaintiff's doctors responded to the plan's requests. Id. Eventually, the plaintiff's internist responded that the plaintiff could not function even at sedentary work because of the fibromyalgia and pain and stated that the plaintiff was medically disabled from her job as a secretary. Id. at 973-74. The Ninth Circuit found that the Plaintiff's doctors had only reiterated conclusory findings of disability and had not answered the plan's reasonable questions as to why they thought the plaintiff was disabled. As such, the Ninth Circuit found the plaintiff had failed to demonstrate a conflict of interest in the plan's investigation with the doctors. Id. at 977-78. The Ninth Circuit reasoned:

> Somebody has to make a judgment as to whether a medical condition prevents a person from doing her work, and the governing instrument assigns the discretion to the claims administrator. With a condition such as fibromyalgia, where the applicant's physicians depend entirely on the patient's pain reports for their diagnoses, their ipse dixit cannot be unchallengeable. That would shift the discretion from the administrator, as the plan requires, to the physicians chosen by the applicant, who depend for their diagnoses on the applicant's reports to them of pain. That the administrator ultimately rejects the applicant's physicians' views does not establish that it "ignored" them.

Jordan, 370 F.3d at 878. While finding that the plaintiff's chart contained objective and subjective indications of the plaintiff's illness, see id. at 880, nowhere in its opinion did the Ninth Circuit find that the plan was required to call the doctor after receiving unclear medical records.

//

---

[1] The court recognizes this case was decided prior to Abatie. However, it provides some guidance on what type of an investigation is required.

## A. Plaintiff's Testimony

As discussed above, to testify Plaintiff must first show from the administrative record that Unum had no "meaningful dialogue" with Plaintiff. Based on Plaintiff's own description of the record, the court cannot find the absence of a meaningful dialogue. Plaintiff's real complaint is that Unum did not listen to him or believe him. This argument goes to the merits of this action, not whether Plaintiff should be allowed to testify.

Plaintiff contends that Unum failed to engage him in dialogue about Unum's assumption that Plaintiff continued to work at Elliott. Unum discussed Plaintiff's presence at Elliott with Plaintiff. Plaintiff was given the opportunity to tell Unum he went to Elliott for three to five hours for signing papers and visiting friends and that he laid down when he was there. Thus, no further evidence from Plaintiff on this issue is necessary.

Plaintiff next contends that Unum failed to engage in a meaningful dialogue to determine Plaintiff's job's material and substantial duties. However, Plaintiff admits that Unum had a face to face interview with Plaintiff about his job. Plaintiff complains that instead of adopting Plaintiff's description of the job, the interviewer was more interested in the job's physical aspects. Plaintiff's real contention is that Unum wrongly categorized his job; this argument goes to the merits of whether Unum properly denied benefits, not whether Unum's investigation was inadequate. Thus, Plaintiff's testimony about his job's duties is unnecessary.

Plaintiff argues that Unum failed to engage in a dialogue with him about his precise complaint and limitations. However, Plaintiff admits that during his face to face interview, Plaintiff noted that his entire middle area was in pain and his condition had nothing to do with stooping or lifting. Plaintiff himself told Unum that the problem was not the inability to do physical activities but that Plaintiff could not concentrate because of pain. Plaintiff's problem is with Unum's failure to accept Plaintiff's description, not that they never talked to Plaintiff about his condition. Thus, further testimony is not needed.

Unum spoke to Plaintiff on January 1, 2002 and in March 2002 about his claim,

condition, and need to communicate with Plaintiff's attending doctor.  Unum wrote letters asking Plaintiff to provide updated information about his condition.  Plaintiff was called when his benefits were suspended in July and allowed to explain his trips to Elliot.  On September 30, 2003, Unum's investigator met with Plaintiff and his attorney, and Plaintiff was given the opportunity to provide additional information.  Plaintiff's attorney was given copies of all the surveillance videos.  Plaintiff's attorney was contacted in November 2003, and told about Plaintiff's doctor's responses to the surveillance.  In November 2003 Plaintiff was told by letter the reasons for Unum's denial.

Plaintiff has not cited at what time he was not given the opportunity to provide Unum with information or when Unum did not provide him with necessary information.  As such, Plaintiff has failed to show what Unum should have asked Plaintiff or discussed with Plaintiff that it failed to do.  Thus, Plaintiff will not be allowed to testify about what he would have said had he been asked for additional information.

**B. Plaintiff's Doctors**

Preliminarily, it is not entirely clear what doctors' testimony Plaintiff desires to admit and have the court consider.  In Plaintiff's original brief requesting permission to submit evidence outside the record, Plaintiff refers to his "treating physicians".  It appears that Plaintiff is primarily referring to Dr. Azevedo, Plaintiff's primary treating doctor.  However, this is not clear from Plaintiff's briefing. Because Plaintiff's brief is vague on the issue of what is even missing from the administrative record, which Unum should have discovered with a proper investigation, Plaintiff's request fails on its face.  Regardless, no further testimony will be considered.

*1. Letter To All Doctors Regarding the Video*

Plaintiff contends that Unum did not ask enough information from Plaintiff's doctors when Unum provided them with the surveillance video.  Unum sent Plaintiff's doctors a copy of the surveillance video with a letter. The letter stated that Plaintiff's job is sedentary and that given the observed activities on the video, it was Unum's opinion that Plaintiff had full time

work capacity.  Unum asked the doctors to sign the letter if they agreed, or if they did not, provide Unum with a list of restrictions and limitations along with copies of all office notes, test results, and consultative reports.  Plaintiff argues that Unum never contacted the doctors to ask them if the video negated any of Plaintiff's allegations about his disability or ask them their general impressions of the surveillance video.  It is unclear what specific, additional information Plaintiff believes any doctor would have provided.  Two doctors agreed Plaintiff could do sedentary work, one deferred to a pain specialist, and Dr. Azevedo disagreed.   In his response, Dr. Azevedo expresses his opinion that one day's activities should not be taken out of context and his belief that Plaintiff's primary complaint was the inability to sit for long periods of time - a fact Dr. Azevedo did not believe was negated by the video.  Thus, it is unclear what further questions Unum should have asked.

Plaintiff objects to the letter's request for the doctors' opinions on Plaintiff's ability to do a sedentary occupation instead of asking the doctors whether the video negated a specific symptom claimed by Plaintiff.  This argument goes to whether Unum properly categorized Plaintiff's job as sedentary and/or whether Unum should have measured Plaintiff's ability to work against his exact job activities.   To the extent the letter did not list Plaintiff's claimed symptoms, the court recognizes that Plaintiff's own doctors would know Plaintiff's symptoms.  Plaintiff is assuming that absent some specific instruction from Unum, Plaintiff's doctors blindly viewed the surveillance video in insolation, as though they knew nothing about Plaintiff other than what they saw on the surveillance video.  Absent some offer of proof that one of the doctors simply measured the person in the surveillance video against a reasonable person's ability to do a sedentary job, without taking into account their knowledge of Plaintiff, the court will not make this assumption.  The court finds no further evidence from the doctor's about the video is necessary.

//

### 2. Dr. Javaid

Plaintiff notes that on February 12, 2001, Dr. Javaid diagnosed Plaintiff with "Chronic Pain Syndrome." Plaintiff then complains that Unum never contacted Dr. Javaid or followed up on Dr. Javaid's assessment. Plaintiff also complains that Unum never referenced Dr. Javaid's diagnose in its documents. Plaintiff's complaint addresses Unum's failure to consider Dr. Javaid's records that were in Unum's possession. Because there is no allegation that Dr. Javaid's records or diagnosis were unclear, Plaintiff offers no reason for Unum to have contacted Dr. Javaid and asked for further information.

Unum considered the fact that Dr. Javaid did not indicate aggressive treatment or additional testing to negate Plaintiff's claim. Plaintiff complains that Unum failed to ask Dr. Javaid why he did not do aggressive treatment or additional testing. Such additional questioning is asking Unum to be an improper advocate for Plaintiff's health care. If such additional questioning is required for every diagnosis or opinion, there would be a never ending back and forth between all the doctors and Unum. There are two reasonable conclusions that ca be drawn from the fact Dr. Javaid did not propose aggressive treatment or additional testing. First, no additional treatment would help Plaintiff and there was no additional test that Dr. Javaid believed would offer new information. In the alternative, Dr. Javaid did not believe Plaintiff's condition was too serious or he would have at least suggested some treatment. Whether Unum made the correct conclusion goes to the merits of the case, not whether Unum should have asked Dr. Javaid additional questions. Thus, Dr. Javaid will not be permitted to testify.

### 3. Dr. Azevedo

Plaintiff contends that Unum should have asked Dr. Azevedo further questions at several times. The parties agree that Nurse Cross conducted an evaluation of Plaintiff's file after he had been treated for several months. Plaintiff contends that Nurse Cross never obtained an MRI report missing from the records Dr. Azevedo provided to Unum. The evidence in the file shows that Nurse Cross asked Dr. Azevedo's staff for MRI report's results referenced in Dr. Azevedo's

medical reports. When Dr. Azevedo's staff provided further records, the MRI report was still not among them. Because Nurse Cross determined that the MRI report was needed but then failed to follow up on her request, an inference can be made that a complete investigation should have included further requests for the MRI report from Dr. Azevedo's staff. The court finds that this situation appears to be similar to <u>Saffon</u>, where the Ninth Circuit found the plan should have done more when a doctor failed to respond. Because a complete Administrative Record should include this MRI report, the court will allow Plaintiff to supplement the Administrative Record with the MRI report.

Plaintiff next contends that Nurse Cross failed to ask further questions about Dr. Azevedo's Progress Reports. Plaintiff admits that from August 14, 2001 to January 23, 2002, Unum received eight[2] Progress Reports and one Initial Evaluation from Dr. Azevedo. These notes recognize had chronic pain and drug dependancy, but they do not discuss any treatment. Plaintiff argues that Nurse Cross should have called Dr. Azevedo to ask why Dr. Azevedo was not providing Plaintiff with further treatment. Such a phone call is simply asking too much. Unum is not intended to be an advocate for Plaintiff's health care.

Plaintiff also complains that Nurse Cross improperly listed dependency as Plaintiff's primary diagnosis and chronic pain as a secondary diagnosis; Yet, Dr. Azevedo never made a primary and secondary diagnosis. Plaintiff argues that this mistake caused problems when Unum reviewed Plaintiff's file later. Plaintiff complains Nurse Cross improperly considered Plaintiff's X-Ray reports. These arguments goes to whether Unum improperly read Dr. Azevedo's records, not whether Dr. Azevedo should have been asked further questions. Thus, no further testimony from Dr. Azevedo about these issues will be allowed.

On March 20, 2002, Unum had a telephone consultation with Dr. Azevedo. While Dr. Azevedo said Plaintiff had unexplained lumbar pain, Dr. Azevedo did not provide a reason for the pain. Dr. Azevedo said further testing was in progress. Plaintiff complains that Unum

---

[2] Plaintiff references there being both eight and nine reports.

never had further telephone conversations with Dr. Azevedo after this telephone consultation. However, given that Unum reviewed Dr. Azevedo's further records, the court cannot find a further telephone call was required. No statute or case authority requires a plan to obtain information from a doctor through telephone conversations. To the extent Unum never asked Dr. Azevedo why he did not do further testing, Plaintiff is again asking Unum to be an advocate for Plaintiff's health care, rather than a reviewer of whether Plaintiff's medical condition caused Plaintiff to be disabled. Thus, Dr. Azevedo will not be allowed to testify about what he would have said had Unum called him at other times.

Plaintiff contends that Unum did not follow up with Dr. Azevedo when he failed to completely fill out an Estimated Foundational Ability form. The court has reviewed the Estimated Foundational Ability form dated December 17, 2002. See AR at 406-07. On the first page, Dr. Azevedo checked boxes concerning Plaintiff's ability to do various physical activities. The form then asks if the estimated functional capacity is based upon the patient's report, the doctor's measured capacity, or clinical experience. This question is not answered. The court declines to find that Unum failed to conduct a proper investigation by not obtaining an answer to this question. There is no indication that the lack of an answer was ever held against Plaintiff. In addition, the court finds an answer would assist Plaintiff's case. On the second page, the form asks the doctor to comment on any additional medical factors that impact the patient's functional ability, including additional treatment or accommodation that might help improve function. This question does not necessarily require a response. Dr. Azevedo's failure to answer the question implied that there is no accommodation or treatment that would help Plaintiff's function. After filling out questions about Plaintiff's ability to do various levels of activity, the form states that if hours were listed in more than one category, Unum would assume the patient could do the sum of those hours. The doctor is asked to explain if this was not the doctor's intent. Given that Dr. Azevedo only listed hours for sedentary activities, this question is moot. The form next asks at what point in time the doctor feels there will be a significant change. Again, this question does

not necessarily require a response. Dr. Azevedo's failure to answer the question implied that he did not believe there would be a significant change. Finally, the form asks for comments. Because "comments" implies an optional response, Dr. Azevedo's failure to include comments implies that he had none to offer. Requiring Unum to question Dr. Azevedo's responses to the form goes beyond a reasonable investigation. The questions left un-answered are either optional questions or questions from which the reader can assume a response. Thus, Dr. Azevedo will not be allowed to testify about what his answers to these questions would have been if Unum had asked him to complete the form.

In December 2002, Unum asked Dr. Azevedo if there had been significant changes to Plaintiff's condition and what the current pain management treatment was. Plaintiff complains that this letter should have asked specific questions about Plaintiff's functional capacity and Dr. Azevedo's diagnosis. While one could argue it might have been helpful for Unum to ask Dr. Azevedo very specific questions about what Plaintiff could do, Plaintiff fails to show that all of the records Unum did have failed to convey this information. Plaintiff is placing too high a duty on a plan to obtain information favorable to the insured. Thus, Dr. Azevedo will not be permitted to testify.

*4. Dr. Rauf*

Dr. Rauf filled out an "Estimated Functional Abilities" and "Attending Physician's Statements" questionnaires that Unum sent him. Dr. Rauf indicated that Plaintiff's functional ability would not change. In February 2003, Dr. Rauf submitted a report that Plaintiff was permanently disabled and unable to perform any work. On July 21, 2003, Dr. Rauf sent Unum a letter stating that Plaintiff had been his patient for many years, Plaintiff had received various treatments with no relief, Plaintiff's pain was chronic, Plaintiff could not work, and Unum could contact him if it had any questions. Plaintiff complains that Unum did not follow up with Dr. Rauf about his opinions. Dr. Rauf's letter and Dr. Rauf's answers on Unum's forms are clear. The fact Unum choose to discount this evidence is an argument Plaintiff can make when the

court resolves this action's merits. At this time, there is no authority that a proper investigation requires an insurance company to follow up on a letter or document that is clear.

Plaintiff is asking too much of Unum. Unum had Plaintiff's complete records. Unum made inferences from these records. Nothing required Unum to try to obtain further treatment for Plaintiff or try to talk Plaintiff's doctors into conducting further testing or treatment. Nothing required Unum to give Plaintiff's doctors an unlimited opportunity to talk Unum out of its conclusions. The type of interminable back-and-forth Plaintiff suggests is similar to that which was cautioned against in <u>Silver</u>.

**ORDER**

Based on the above memorandum opinion, the court ORDERS that:

1. Plaintiff is precluded from introducing Plaintiff's testimony or declaration and Plaintiff's treating physicians' testimony or declarations at trial;
2. If the MRI results are not already in the Administrative Record, Plaintiff may submit this document and the court will consider it;
2. The parties are ORDERED to meet and confer prior to May 4, 2009 to discuss dates for trial and the filing of proposed Findings of Fact and Conclusions of Law;
3. The court will hold a telephonic status conference on this matter for the purpose of setting further dates, on May 4, 2009 at 2:30 p.m.. The parties are DIRECTED to arrange for a conference call and call the court's polycom number at 559-499-5669.

IT IS SO ORDERED.

**Dated:   April 15, 2009**              /s/ Anthony W. Ishii
                                   CHIEF UNITED STATES DISTRICT JUDGE