IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TERRY ALUISI, | ) | NO. 1:04-CV-05373-AWI-SMS |
| | ) | |
| Plaintiff, | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSION OF LAW |
| v. | ) | |
| | ) | ORDER DIRECTING THE CLERK |
| ELLIOTT MANUFACTURING CO., | ) | OF THE COURT TO ENTER |
| INC. PLAN; ELLIOTT | ) | JUDGMENT FOR DEFENDANTS |
| MANUFACTURING CO., INC., as the | ) | |
| PLAN ADMINISTRATOR, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FINDINGS OF FACT

**1.** Defendant Elliott Manufacturing Co., Inc. ("Elliott") is a California Corporation incorporated in 1929.

**2.** Elliott had an employee welfare benefit plan, which included a group long term disability plan (the "Plan").

**3.** The Plan provides benefits through Unum's Group Insurance ("Unum") Policy No. 505313 001 ("the Policy").   Unum issued the Policy to Elliott Manufacturing, Inc., effective March 1, 1996.

**4.** The Certificate Section of the Policy states that "[w]hen making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy" (Administrative Record, bates

pages U/A/ 26 .)[1].

**5.**     Unum acts as the claims review fiduciary for long term disability claims under the Plan, and Elliott is the Plan Administrator (26, 50).

**6.**     The terms of the Policy provide that, "You are disabled when UNUM determines that:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and

- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

You will continue to receive payments beyond 24 months if you are also:

- working in any occupation and continue to have a 20% or more loss in your indexed monthly earnings due to your sickness or injury; or

- not working and, due to the same sickness or injury, are unable to perform the duties of any gainful occupation from which you are reasonably fitted by education, training or experience."

**7.**     The maximum period of payment is to age sixty-five.  However, benefits will end "during the first 24 months of payments, when you are able to work in your regular occupation on a part-time basis but you choose not to," or on "the date you are no longer disabled under the terms of the plan" (40).

**8.**     Unum's benefits specialists do not have access to any of the Company's financial information, other than that which is publicly available, and their compensation is not based on denying claims (Declaration of Carolyn Brooks ¶ 2).

**9.**     Unum also periodically rotates and/or reassigns its claims handlers, in an effort to reduce the potential for bias in claims handling (Declaration of Carolyn Brooks ¶ 3).

**10.**   Unum received Aluisi's claim for long term disability benefits on January 3, 2002 (1).

**11.**   Aluisi indicated that he had been unable to work since October 26, 2001 due to

---

[1] All further citations are to the Administrative Record unless otherwise noted.

2

back pain  (1).  Aluisi described his disability as ***"unable to sit, walk, or stand without pain."***  (1 *emphasis added*).   According to Elliott's controller, Aluisi was Elliott's General Manager/Chief Operations Officer (4).

**12**.   Mazhar Javaid, M.D. (pulmonary and internal medicine specialist) completed the Attending Physician's Statement submitted with Aluisi's claim.  Dr. Javaid stated that Aluisi was unable to work due to severe back pain caused by thoracic disc disease, a condition he had received treatment for since April 2000.   Dr. Javaid stated the Aluisi's symptoms were "severe back pain."   Dr. Javaid also indicated that Aluisi should be able to return to work on June 15, 2002 (8).

**13**.   When Unum received this information, it contacted Aluisi to let him know that the claims administrator would be contacting his doctors to obtain confirming medical evidence (177-178).

**14**.   On January 29, 2002, Unum conducted a phone interview with Aluisi.   Aluisi stated that since stopping any pain medication, Aluisi's pain in the middle of his back was so severe he could not function.  (144).

**15**.   Unum obtained Dr. Javaid's records (168-176).   Melanie Cross, R.N. reviewed Dr. Javaid's records on February 22, 2002 (181-82).

**16**.   Nurse Cross determined that the treatment notes did not support a claim of thoracic pain.  She noted that the x-ray of the thoracic spine demonstrated the expected changes for Aluisi's age group.  She also noted that Dr. Javaid's records did not contain any plan of care.  Nurse Cross concluded that the available records did not support the claim (181-182).

**17**.   Unum next obtained records from Dr. Michael Azevedo (Physiatrist) in March 2002 (191-213).   Dr. Azevedo's records stated as follows:

**A**.   On August 14, 2001, Aluisi saw Dr. Azevedo.  Dr. Azevedo reported that Aluisi had developed chronic back pain after gastric bypass surgery and had become physically dependent on Hycodan.  Dr. Azevedo noted Aluisi's pain was in the middle of the mid-

3

thoracic area, radiates across the back, is constant,  is very sharp, and the pain level is eight out of ten without medications.  Dr. Azevedo noted that Aluisi was resting comfortably in a chair, able to transfer from a seated to a standing position without difficulty, and ambulates with a nonantalpic gait.  Dr. Azevedo assessed Aluisi with discogenic thoracic spine pain and having withdrawal symptoms (211-213).

**B.**     On August 27, 2001, Aluisi saw Dr. Azevedo.  Dr. Azevedo reported that Aluisi had developed chronic back pain after gastric bypass surgery and had become physically dependent on Hycodan.  Dr. Azevedo noted that Aluisi was resting comfortably in a chair, able to transfer from a seated to a standing position without difficulty, and ambulates with a nonantalpic gait.   Dr. Azevedo assessed Aluisi with chronic back pain and physical dependence (209).

**C.**     On September 13, 2001, Aluisi saw Dr. Azevedo.   Dr. Azevedo reported that Aluisi had developed chronic back pain after gastric bypass surgery and had become physically dependent on Hycodan.  Dr. Azevedo noted that Aluisi was resting comfortably in a chair, able to transfer from a seated to a standing position without difficulty, and ambulates with a nonantalpic gait.   Dr. Azevedo assessed Aluisi with chronic right flank pain and physical dependence (207-209).

**D.**     On September 26, 2001, Aluisi saw Dr. Azevedo.   Dr. Azevedo reported that Aluisi had developed chronic back pain after gastric bypass surgery and had become physically dependent on Hycodan.  Dr. Azevedo noted that Aluisi was resting comfortably in a chair, able to transfer from a seated to a standing position without difficulty, and ambulates with a nonantalpic gait.   Dr. Azevedo assessed Aluisi with chronic upper thoracic back pain and physical and psychological dependence (205).

**E.**     On October 9, 2009, Aluisi saw Dr. Azevedo.   Dr. Azevedo reported that Aluisi had developed chronic back pain after gastric bypass surgery and had become physically dependent on Hycodan.  Dr. Azevedo noted attempts to change medication and reduce

4

Aluisi's physical dependence.   Dr. Azevedo noted that Aluisi was resting comfortably in a chair, able to transfer from a seated to a standing position without difficulty, and ambulates with a nonantalpic gait.   Dr. Azevedo assessed Aluisi with chronic low back pain and physical dependence (203).

**F.**      On October 23, 2001, Aluisi saw Dr. Azevedo.  Dr. Azevedo reported that Aluisi had developed chronic back pain after gastric bypass surgery and had become physically dependent on Hycodan.   Dr. Azevedo noted Aluisi's plans for detoxification.   Dr. Azevedo assessed Aluisi with physical dependence and chronic back pain (201).

**G.**      On November 13, 2001, Aluisi saw Dr. Azevedo.   Dr. Azevedo reported a significant increase in back pain now that Plaintiff was off opiate analgesics, from which Plaintiff had recently been detoxified.  Dr. Azevedo noted that Aluisi was resting comfortably in a chair, able to transfer from a seated to a standing position without difficulty, and ambulates with a nonantalpic gait.   Dr. Azevedo assessed Aluisi with chronic thoracic pain (199).

**H.**      On December 14, 2001, Aluisi saw Dr. Azevedo.   Dr. Azevedo reported that Aluisi had continued to have severe, upper posterior infrascapular, back pain, which was sharp in character and nonradiating.   The pain was seven out of ten.  Dr. Azevedo noted that Aluisi was resting comfortably in a chair, able to transfer from a seated to a standing position without difficulty, and ambulates with a nonantalpic gait.  Dr. Azevedo assessed Aluisi has having myofascial or neurogenic pain (197).

**I.**      On January 18, 2002, Aluisi saw Dr. Michael P. Azevedo.   Dr. Azevedo reported that Aluisi was having severe pain in the thoracic area, with occasional radiation around to the front.  In addition, Dr. Azevedo reported Aluisi was having right hip pain.   Dr. Azevedo reported that Aluisi stated his pain limits his ability to do his daily activities. Dr. Azevedo noted that Aluisi was resting comfortably in a chair, able to transfer from a seated to a standing position without difficulty, and ambulates with a nonantalpic gait.

5

Dr. Azevedo assessed Aluisi with chronic thoracic and some low pack pain, with right hip pain. (195).

**18**.     Nurse Cross reviewed Dr. Azevedo's records (216-219).  Nurse Cross noted that the lack of prescription pain medication following Aluisi's narcotic detoxification and the repeated examination findings that Aluisi was "sitting comfortably" did not support the reports of disabling pain.  Nurse Cross concluded that the available medical records did not support the claim, but recommended that the file be referred to an on site physician ("OSP") for review and comment (219).

**19**.     On February 22, 2002, Aluisi saw Dr. Azevedo.  Dr. Azevedo noted that Aluisi was complaining of thoracic back pain, with some radiation around to the front.  Dr. Azevedo noted that the pain is moderate in severity, and it hurts worse when he walks or does truncal motions.  Dr. Azevedo referred to X-Rays "which showed degenerative changes in the thoracic spine and spondylolisthesis, with spondylosis at the L5-S1.   The laboratory shows a SED rate of 72, a TSH of 0.13 and a CPK was 22."  (222).

**20**.     Raymond Gritton, M.D., a physical medicine and rehabilitation specialist, reviewed the medical records from Dr. Javaid and Dr. Azevedo on March 7, 2002.  Dr. Gritton noted that Aluisi had mild degeneration of the thoracic spine and spondylosistheses in the lumbar spine.  Dr. Gritton recommended obtaining an attending physician's statement from Dr. Azevedo before commenting on reasonable restrictions and limitations  (220).

**21**.     On March 12, 2002, Nurse Cross reviewed additional records provided by Dr. Azevedo, including X-Ray reports.   The additional records did not alter her prior opinion (228-229).

**22**.     Unum medical consultant Michael C. Randall, M.D., spoke with Dr. Azevedo on March 29, 2002  (233).  Dr. Azevedo stated that Aluisi complained of unexplained "intractable" lumbar pain since his gastric bypass surgery, which did not appear to be a complication of the surgery.  Dr. Azevedo reported that further testing was in progress, and he estimated "that it will

take a month to clarify this puzzling case".   Dr. Randall recommended further evaluation, but stated that Aluisi appeared to be totally disabled  (234).

**23**.      On April 1, 2002, Unum received confirmation of Aluisi's salary and bonus information from Elliott (240-243).

**24**.      By letter dated April 3, 2002, Ms. Beam notified Aluisi that his claim was approved, effective January 25, 2002 (244-246).  The approval letter further states: "We are approving benefits at this time.  However, in order to qualify for ongoing benefits, you must continue to meet the definition of disability in your contract.  We may request that you provide additional medical and/or vocational information on a periodic basis to support your claim for disability benefits."  (244).

**25**.      In May 2002, Unum asked Aluisi for an updated certification of disability (284). Unum also asked Dr. Javaid for all medical records and diagnostic tests since February 2002 (285).

**26**.      In a supplemental statement completed in June 2002, Aluisi stated that he had chronic back pain which impacted his ability to sit, stand, and walk, as well as trouble sleeping (287).   Aluisi described his daily activities as "watching TV, visiting my parents."   Aluisi noted that his sister helped him (287).

**27**.      In July, Unum received updated records from Dr. Azevedo (291-322).  Dr. Azevedo's records stated as follows:

**A.**      On March 29, 2002, Aluisi saw Dr. Azevedo.  Dr. Azevedo reported that Aluisi's pain had gotten to a point where the pain was so severe that he could not sit or even think at work because he is so preoccupied with pain (298).   Dr. Azevedo noted that the pain was across Aluisi's lower back and thoracic area and it was moderate to severe in severity.      Dr. Azevedo noted that Aluisi was resting in a chair but appeared to be in at least a moderate degree of pain, with frequent changes in position (298).   Dr. Azevedo assessed Aluisi with severe thoracic back pain of unknown etiology.   While noting an

apparent T8-9 disc injury and degenerative changes, Dr. Azevedo concluded these injuries did not adequately explain the severity of Aluisi's back pain  (298).

**B.** On May 30, 2002, Aluisi saw Dr. Azevedo.  Dr. Azevedo reported that Aluisi had constant, moderately severe, midline back pain that does not change with position (296). Dr. Azevedo noted that Aluisi was resting comfortably in a chair, able to transfer from a seated to a standing position without difficulty, and ambulates with a nonantalpic gait. Dr. Azevedo assessed Aluisi with chronic mid-thoracic pain (296).

**28.** In July 2002, Unum received an Attending Physician's Statement and Estimated Functional Activities form from Dr. Khalid Rauf, Madera Pulmonary and Sleep Disorders Center (327-329).  Dr. Rauf reported that Aluisi was unable to bend, exercise, or walk for a long time due to chronic back pain.  Dr. Rauf's estimated return to work date for Aluisi was April 29, 2003 (327).

**29**. In September 2002, Unum obtained updated records from Dr. Javaid and his colleague, Dr. Rauf, at the Madera Pulmonary and Sleep Disorders Center (333-395).  These records assess Aluisi as having chronic back pain between August 6, 2001, and July 23, 2002. Earlier medical records also report complaints of back pain and reports of disc protrusion at T8-T9.

**30**. Unum's Nurse Consultant JoAnn Orozco, R.N., performed a medical review on November 18, 2002 (398-399).  Nurse Orozco reviewed the prior nurse review, Dr. Randall's notes of his conversation with Dr. Azevedo, and the updated medical records from Drs. Javaid, Rauf, and Azevedo.   Nurse Orozco recognized Aluisi's chronic back pain was the main disabling condition (399.)   However, Nurse Orozco noted that there had been no further diagnostic studies and no clear treatment plan.  Nurse Orozco concluded that in the absence of a more aggressive treatment plan or new diagnoses, the restrictions and limitations for no work capacity appeared excessive (399.)

**31**. Nurse Orozco wrote to Dr. Azevedo, asking whether Aluisi's condition had

8

changed, whether there had been additional testing, and a statement of the current pain

management treatment  (401).  Nurse Orozco also sent Dr. Azevedo an Estimated Functional

Abilities form, requesting information with respect to Aluisi's functional capacity (402-403).

**32**.    In January 2003, Dr. Azevedo returned the Estimated Foundational Abilities form

(406-407).  In that form, Dr. Azevedo indicated that Aluisi had 4-8 hours of sedentary work

capacity.   Sedentary activity was defied as "10lbs. Maximum lifting or carrying articles.

Walking/standing on occasion.  Sitting 6/8 hours" (407).

**33**.    In January 2003, pain consultant Robert G. Salazar, M.D., performed an

evaluation of Aluisi (773-776).  Dr. Salazar stated Aluisi's chief complaint was thoracic pain,

posterior (733).  Dr. Salazar described Aluisi's current symptoms as follows:

| | | |
|---|---|---|
| Location | : | Posterior thoracic spine lower segments |
| Quality | : | Burning. |
| Severity | : | Moderate to severe. |
| Duration | : | Frequent to constant. |
| Timing | : | Spontaneous. |
| Modifying Factors | : | None. |
| Associated Signs and Symptoms | : | None. |

(773).  Dr. Salazar diagnosed Aluisi with thoracic radiculitis and pain in thoracic spine.  (775).

Dr. Salazar's musculoskeletal examination revealed no tenderness and no pain reported on

flexion, extension, and rotation (774).   Dr. Salazar recommended nerve  injections, which Aluisi

declined.  Dr. Salazar referred Aluisi back to Dr. Azevedo (775).

**34**.    Dr. Javaid's medical records from November 21, 2002 to January 20, 2003,

assessed Aluisi with chronic pain syndrome  (440-442).

**35**.    Unum also received updated medical records from Dr. Azevedo's office in

February 2003 (419-429).  Dr. Azevedo's records stated as follows:

**A.**    On July 8, 2002, Aluisi saw Dr. Azevedo.  Dr. Azevedo reported that Aluisi still

had severe upper and middle thoracic back pain that is moderate to severe in severity.

Dr. Azevedo stated Aluisi could "only stand for about five minutes and sit for about five

minutes and his walking tolerance is only five to ten minutes because his back pain

9

becomes so severe that he has to sit down or lie down." (424).   Dr. Azevedo noted that Aluisi had reported that he had tried to go to the store but could not finish shopping because of the severity of the back pain.   Dr. Azevedo wrote in his report that Aluisi was resting comfortably in a chair, able to transfer from a seated to a standing position without difficulty, and ambulates with a nonantalpic gait.  Dr. Azevedo assessed Aluisi with chronic mid-thoracic back pain  (424).

**B.**     On October 2, 2002, Aluisi saw Dr. Azevedo.  Dr. Azevedo reported Aluisi's pain as follows:

> He says that the pain is intermittent but occurs most of the time.
> There is no day that he does not have a significant amount of pain.
> He feels that he has unbearable pain that occurs about 75 percent of
> the time and the bearable pain occurs about 15 percent of the time,
> and no pain only about 10 percent of the time.

(422).   Dr. Azevedo noted that Aluisi was resting comfortably in a chair, able to transfer from a seated to a standing position without difficulty, and ambulates with a nonantalpic gait.  Dr. Azevedo assessed Aluisi with chronic intractable pain (422).  Dr. Azevedo gave Aluisi Duragesic , 25-mcg, and if the pain continues, Dr. Azevedo would consider a 50-mcg dose of the Duragesic.

**C.**     On November 1, 2002, Aluisi saw Dr. Azevedo.  Dr. Azevedo reported Aluisi claimed the Duragesic had too many side effects and it was not able to help his pain.   Dr. Azevedo noted that Aluisi stated that he continued to have the same pain, which was fairly unbearable.   Dr. Azevedo noted the pain was in the mid-upper abdomen and back. Dr. Azevedo noted that Aluisi said that he as "unable to do any sitting, standing, or waking for more than 30 minutes at a time without a rest, because of the pain." (421). Dr. Azevedo noted that Aluisi was resting comfortably in a chair, able to transfer from a seated to a standing position without difficulty, and ambulates with a nonantalpic gait. Dr. Azevedo assessed Aluisi with chronic abdominal pain and back pain (421).

**D.**     On December 6, 2002, Aluisi saw Dr. Azevedo.  Dr. Azevedo reported that Aluisi

had developed mid-back pain and upper abdominal and chest pain (420).   Dr. Azevedo reported that Aluisi had been limited to a sedentary lifestyle and cannot concentrate frequently during the day because of his pain.   Dr. Azevedo noted that Aluisi rarely goes out, but if he tries to go out for a couple of hours to socialize, the pain becomes so severe that he has to return home within a couple of hours.   Dr. Azevedo noted that Aluisi was resting comfortably in a chair, able to transfer from a seated to a standing position without difficulty, and ambulates with a nonantalpic gait.  Dr. Azevedo assessed Aluisi with chronic neuropathic pain.  (420).

**36.**     Unum received a job description from Aluisi's employer in February 2003 (430-32).  This evaluation stated that Aluisi's job required 50 hours plus per week.   The evaluation noted the job required standing, walking, and sitting for long periods, although the duration varied daily (430).   The evaluation did not state Aluisi's job required lifting, carrying, or pushing/pulling.   The evaluation did not state Aluisi's job required repetitive motions such as climbing, bending, squatting, and twisting  (431).   The evaluation stated Aluisi's job required maintaining working speed, sustained attention to duties, making independent judgments, and resistive tasks, such as use of a computer and calculator (431).   Aluisi also provided a description of his job duties during an interview on September 30, 2003 (837).

**37.**     On February 18, 2003, Jon P. Veltri, a Unum Vocational Rehabilitation Consultant, performed a Vocational Review and concluded that Aluisi's occupation was sedentary in nature (433-35).

**38.**     On February 19, 2003, Dr. Rauf provided Unum with a Estimated Functional Abilities form.  On the form, Dr. Rauf reported that Aluisi was unable to perform any work activities and was permanently disabled  (437-438).

**39.**     On March 25, 2003, Ms. Beam called Aluisi and asked about his disability status (714-715).  Aluisi advised that he was in constant pain and that if he stood for more than 10-20 minutes, he was "shot for the whole day."  (714.)

**40.**     In April 2003, the State of California Department of Social Services informed Unum that Aluisi had applied for disability benefits administered by the Social Security Administrator (467).  Unum was never informed by the Social Security Administration that it approved Aluisi's claims.

**41.**     Ms. Beam spoke with Aluisi in May 15, 2003 (716-717).  Ms. Beam asked Aluisi how he was doing and he reported that he is "always in agony."   Aluisi reported that he could only walk/stand/sit for 10-20 minutes before his pain became unbearable (716).   Aluisi stated that he would go into work to sign board meeting papers two to three times a month, but he went in and out because he is in "agony".    Aluisi described his pain level as "unbearable" and stated that he was "in constant agony"  (717).

**42.**     On May 20, 2003, Aluisi signed a Claimant's Supplemental Statement form (483-484).   Aluisi described his condition as chronic pain (483).

**43.**     Based on unconfirmed sources that said Aluisi might be working, Unum arranged for surveillance (471-476).  The surveillance team observed Aluisi at Elliott's offices for several hours at a time (785-791).

**44.**     Ms. Beam called Aluisi on July 13, 2003.   When Ms. Beam told Aluisi that he had been observed at Elliott for 3-5 hours at a time, Aluisi averred that he went to the office to sign papers, visit friends, and lay down (718).

**45.**     Ms. Beam requested additional surveillance to confirm Aluisi's activity level and to document whether Aluisi was working (486-487).

**46.**     In June, Unum received updated medical records from Dr. Javaid and Dr. Rauf (502-512).  Medical records between April 18, 2003, and  May 16, 2003, assessed Aluisi with chronic pain (502-503).

**47.**     On June 25, 2003, Ms. Beam discussed Aluisi's claim with a Claim Consultant and with the Special Investigations Unit (687).

**48.**     Ms. Beam wrote to Aluisi informing him of the suspension of his benefits pending

clarification of his disability status (520-521).  Ms. Beam explained that due to Aluisi's observed activities, Unum was unclear as to his physical capabilities.  In order to clarify Aluisi's disability status, Ms. Beam told Aluisi that Unum was in the process of scheduling an independent medical evaluation  (521).  Ms. Beam also wrote to Elliott and asked whether Aluisi was working (527-528).

**49.**     By letter dated July 16, 2003, Aluisi's attorney wrote Ms. Beam (523-524).   The letter stated that Aluisi was completely and totally disabled as a result of a stomach condition. The letter stated Aluisi was unable to sit, stand, or walk for a period lasting any longer than 15 minutes (523).

**50.**     Ms. Beam also obtained a narrative from Dr. Rauf (533).  Dr. Rauf stated that Aluisi had been a patient for many years.   Dr. Rauf stated that although Aluisi had undergone various diagnostic procedures, there was still no conclusive diagnosis.  Dr. Rauf identified Aluisi's disabling condition as "chronic back pain".   Dr. Rauf stated that Aluisi is unable to stand, walk, or sit for a long period of time  (533).

**51.**     Elliott C.E.O. Thomas Cole reported to Ms. Beam that Aluisi was unable to work due to "chronic pain."  Mr. Cole's letter stated that Aluisi "recognized that he was not performing, and after some discussion he advised me that he was not sure about his medical future and informed me that he was filing for disability based on the advice of his physicians." Mr. Cole also stated that Aluisi did retain a seat on Elliott's Board of Directors and was allowed to come and go as he chose (551).

**52.**     In August 2003, surveillance was arranged because Ms. Beam believed Aluisi intended to travel to Shaver Lake over Labor Day weekend (555).

**53.**     During the period of August 28 through September 1, 2003, the surveillance team observed Aluisi sitting for extended periods of time; walking; squatting; driving a car; pumping gas; rowing a boat; carrying a radio; lifting a cooler; lifting and dragging an inflatable boat; pushing a two-wheel dolly; pushing a shopping cart; bending at the waist; working under the

13

hood of his car; and pushing a shopping cart.   The surveillance indicates that Aluisi drove the approximate one hour drive to Shaver Lake each way on both August 30, 2003, and August 31, 2003.   Upon arriving at the lake on August 30, 2003, Aluisi drove a boat and walked along the shore.   The tape showed activities lasting six to eight hours.   Despite sitting for lengthy periods, Aluisi is not shown to be bent over in any pain.   He also is not observed lying down. (803-835).

**54.**   Ms. Beam spoke to Aluisi by telephone on September 16, 2003 (721-722).   Ms. Beam told Aluisi that Unum wanted to arrange to have a representative perform a field visit with Aluisi.   Aluisi told Ms. Beam that he was in terrible physical and emotional pain  (721).   Aluisi told Ms. Beam that Elliott was 18-25 minutes from his house, and he must lie down after an hour.   If he is not able to lie down, Aluisi said he sat bent in pain during board meetings. Aluisi said that after a trip to Elliot he is in agony the rest of the day (721).   Aluisi told Ms. Beam that if he stood, walked, or sat for more than 15-20 minutes, he is in agony (721).   Aluisi told Ms. Beam that almost every place he goes he has to rest if he needs to stand, sit or walk 722).   Ms. Beam told Aluisi that a representative would call him and set up a time and place for an interview with a field representative  (721-722).

**55.**  During the September 15, 2003 conversation, Ms. Beam told Aluisi a letter had been sent with a time and place for an independent medical evaluation.   (722).   There is no evidence an evaluation was ever scheduled.

**56.**   On September 26, 2009, Ms. Beam told Aluisi that Unum was sending a field representative to meet with Aluisi (722).   Ms. Beam told Aluisi she was postponing the medical evaluation in the hopes that the field visit would be sufficient to allow her to make a final determination.   Aluisi told Ms. Beam that he was fine with not having an IME (722).

**57.**   The field visit took place on September 30, 2003, and lasted from 10:30 a.m. to 11:48 a.m. (836-866).   The interviewer asked Aluisi about the physical demands of his job. (837); the location of his pain (838); the nature and extent of his pain (843-845, 865-862, 864);

14

his daily activities (847); the status of his application for social security benefits (Aluisi stated that his application was declined) (849); his trips to Elliott (851-854); and at the end of the interview, the interviewer offered Aluisi and his attorney the opportunity to add any additional information or to ask any questions (865).

**58.**     During the interview, Aluisi stated that after he quit taking pain killers, he was unable to sit, stand or walk for any length of time (841).   Aluisi stated that the pain was the same as it was when it first started (843).   Aluisi explained that the pain goes through his back and stomach and he cannot stand, sit, or walk for any extended period.   Aluisi confirmed that the pain had nothing to do with stooping, lifting, or twisting.   (845).   Aluisi repeatedly stated that he could not sit, stand or walk for more than about fifteen minutes without a lot of pain (848, 855, 858).

**59.**     In October 2003, Unum provided Dr. Javaid, Dr. Azevedo, Dr. von Kaenel and Dr. Rauf with copies of the surveillance video from the Labor Day weekend, and asked for their review and comment (570-573, 584-587).   The letter stated that it was Unum's opinion that, given the observed activities, Aluisi had full time work capacity in his sedentary occupation.   The letter stated that if the doctor agreed with the assessment, he should sign and date the form.  If the doctor did not agree with this determination, the doctor was to provide Unum with a list of restrictions and limitations and copies of office notes, test results, and consultative reports that supported the opinion.

**60.**     On October 27, 2003, Dr. Javaid and Dr. Rauf signed and returned the letter, adding only that their total review time was four hours (595-596).

**61.**     Dr. von Kaenel responded by letter dated October 17, 2003, stating that he was not Aluisi's primary treating physician, and had not been involved in the placement of any restrictions (598).

**62.**     Subsequently, Dr. Rauf wrote separately to Unum, noting that he could not "negate what the film shows regarding his walking, drive [a] vehicle and carrying and lifting

1    different articles" (601-602).  Dr. Rauf stated that Aluisi had acknowledged to Dr. Rauf that he

2    could walk and do other things, but his main complaint for many years was that he could not sit

3    for a long time and had to lie down to relieve his pain.  Dr. Rauf stated that Aluisi's complaint of

4    pain was a subjective symptom and stated that a pain specialist would be better qualified to

5    address this.

6         63.     On October 29, 2003, Aluisi saw Dr. von Kaenel.   Dr. Von Kaenel reported that

7    previous use of thoracic epidural steroid injection only temporarily relieved Aluisi's thoracic

8    pain, but not his lower flank pain.   Dr. von Kaenel determined that Aluisi was in the category of

9    undiagnosed abdominal pain  (771).

10        64.     On November 20, 2003, Dr. Azevedo and Ms. Beam spoke by telephone (726).

11   Dr. Azevedo stated that, although Aluisi did perform the activities on the surveillance video, he

12   appeared to be in pain.

13        65.     Dr. Azevedo responded by letter dated November 21, 2003, and stated that the

14   surveillance video did not convince him that Aluisi was misrepresenting his disability (605).  Dr.

15   Azevedo stated that although Aluisi could be seen doing several boating activities, carrying

16   objects, and doing some walking, these were isolated incidents that should not be taken out of

17   context, and the video did not show prolonged activities.  Dr. Azevedo did not provide specific

18   restrictions and limitations on Aluisi's condition.

19        66.     Unum Occupational Medicine Specialist Michael C. Randall, M.D., reviewed the

20   file on November 24, 2003 (706-707).  Based on the records reviewed, including the responses of

21   Dr. Rauf, Dr. von Kaenel, and Dr. Javaid regarding the surveillance, Dr. Randall concluded that

22   Aluisi had full-time sedentary work capacity.

23        67.     Dr. Randall performed an additional medical review of Dr. Azevedo's response

24   on November 25, 2003 (727-728).  Dr. Randall noted that it appeared that at the time the

25   surveillance video was taken, Aluisi was not taking any pain medication, but the video did not

26   document someone who was experiencing significant pain.  Dr. Randall did not observe any pain

27

28                                                    16

behavior, such as grimacing, stopping to rest, etc., that would convince him that Aluisi was having difficulties doing activities at home, or during errands or recreational activities at the lake. He concluded that Dr. Azevedo's opinion was not consistent with the surveillance videos.

68.     Based upon the medical and vocational information, Unum determined that Aluisi did not meet the Policy's definition of "total disability" (609-613).  Ms. Beam called Aluisi's attorney on November 26, 2003, to advise him of the decision (729).

69.     Ms. Beam notified Aluisi by letter dated December 4, 2003, that he would not be eligible for additional long term disability benefits (609-613).  Ms. Beam based her decision on the following evidence in the Record:

- Unum's vocational consultant determined that Aluisi's occupation was sedentary, including the ability to change positions at will;

- Dr. Azevedo stated in March 2002 that he was unclear as to Aluisi's functional capacity;

- Unum's medical consultant determined that there was no clear documentation to support impairment, no clear treatment plan, and no more aggressive treatment plan under consideration;

- Pain specialist Dr. von Kaenel stated that he had not been involved in the placement of any restrictions;

- The assessment of Unum's on-site physician was that Aluisi demonstrated prolonged sitting on the surveillance videos; at no time did Aluisi appear to be in discomfort; and that Aluisi's observed activities appeared to exceed the material and substantial duties of his occupation;

- Given the documentation on file and the observed activities, Unum's opinion was that Aluisi had full time work capacity in his sedentary occupation.

70.     Carolyn Brooks, who was a Customer Care Consultant in December, 2003, reviewed and approved Ms. Beam's claims determination (Brooks Declaration ¶ 4).  Ms. Brooks' decision was not based on any financial considerations (*Id.*).  Rather, she based her decision solely on the information contained in the Administrative Record. (*Id.*)

71.     Aluisi appealed the claims determination by letter dated January 21, 2004 (620-621).  On that same day, Aluisi filed suit in Fresno County Superior Court (Court file).

72.     As part of the handling of the appeal, Unum obtained additional records from Dr.

17

von Kaenel (630-641), and Dr. Salazar (741-742, 773-762).  Dr. von Kaenel examined Aluisi on September 8, 2003 (631-635).  On examination, Dr. von Kaenel noted that Aluisi was in no acute distress (632), and Aluisi demonstrated no pain behaviors (633-634).  Dr. von Kaenel concluded that Aluisi had upper abdominal pain, not thoracic pain (640).  Dr. von Kaenel noted that Aluisi had a normal thoracic exam (639), and that the source of his reported pain was undetermined. Dr. von Kaenel did not believe that Aluisi had a source of spine pain, and put him in the category of "undiagnosed abdominal pain" (639).

**73.**      Conversely, Dr. Salazar opined that Aluisi's pain emanated from his thoracic spine, and noted that Aluisi refused a nerve block injection (775).

**74.**      Nurse Consultant Molly Sones, R.N., reviewed the medical records from Dr. Salazar and Dr. von Kaenel and the surveillance videos on February 20, 2004 (743).  She found that Aluisi's self-reported level of pain and restriction did not appear credible, and continued total disability appeared excessive.

**75.**      Physical Medicine and Rehabilitation Specialist George G. Fluter, M.D., reviewed the file on March 23, 2004 (744-745).  Dr. Fluter opined that Aluisi's orthopedic impairments would support restrictions and limitations to avoid repetitive bending, stooping and twisting.  He further stated that these impairments should not preclude performance of sedentary level activities with allowance to change positions periodically for comfort, which was supported by the activities observed on the surveillance video.

**76.**      After reviewing all of the medical and vocational information, Lead Appeals Specialist Odette M. Ramos notified Aluisi by letter dated April 1, 2004, that Unum's prior determination to discontinue payment of long term disability benefits had been upheld on appeal (751-754).  Ms. Ramos based her decision on the following facts:

> •    The initial medical records that Unum received did not document impairment, the x-rays demonstrated only expected changes in light of Aluisi's age, did not substantiate Aluisi's self-reports of pain, and did not indicate that Aluisi was taking pain medication;

> •    Subsequent records documented Aluisi's ongoing subjective complaints of pain,

but noted that on physical exam, Aluisi's strength and range of motion were within normal limits, and that Aluisi was able to transfer and ambulate without difficulty;

- Unum wrote to Aluisi's treating doctors; Dr. von Kaenel deferred to Dr. Javaid, who indicated that Aluisi had full time work capacity; Dr. Rauf stated that Aluisi's complaints were subjective; Dr. Azevedo concluded that activities observed on surveillance did not convince him that Aluisi was misrepresenting his disability;

- The medical documentation in file did not support Aluisi's claim, and the surveillance videotapes demonstrated Aluisi's ability to work in numerous strenuous off work activities;

- On appeal, Unum referred the file for review to a registered nurse and a physician who had not previously reviewed the file;

- Upon review of all of the medical documentation, as well as the information noted in the surveillance reports, it appeared that Aluisi would be able to perform a sedentary occupation on a full time basis with allowance to change positions for comfort;

- Accordingly, Aluisi was not precluded from performing the duties of his own occupation as of June 24, 2003.

**77.**    Ms. Ramos notified Aluisi that he had exhausted his administrative remedies.

**78.**    Unum has a documented history of biased claims administration.  <u>See</u> <u>Saffon v. Wells Fargo & Co. Long Term Disability Plan</u>, 511 F.3d 1206, 1210 (9th Cir. 2008); <u>Cowder-Cowin v. Unum Life Ins. Co. of Am.</u>, 560 F.Supp.2d 1006, 1013 (W.D. Wash. 2008); <u>see also</u> <u>Metropolitan Life Ins. Co. v. Glenn</u>, 128 S.Ct. 2343, 2351 (2008) (citing John H. Langbein, Trust Law As Regulatory Law: The UNUM/Provident Scandal and Judicial Review of Denials Under ERISA, *101 Nw. U. L. Rev.* 1315 (2007)).

## CONCLUSIONS OF LAW

**A.  Standard of Review**

**1.**    ERISA provides for judicial review of a decision to deny benefits to an ERISA plan beneficiary.  <u>See</u> 29 U.S.C. § 1132(a)(1)(B).  It also creates federal court jurisdiction to hear such a claim.  <u>See</u> 29 U.S.C. § 1132(e).  However, the statute does not specify what legal standard the court should apply in making this determination.  <u>See</u> <u>Firestone Tire & Rubber v.</u>

1   Bruch, 489 U.S. 101, 109 (1989).  Under the analysis approved by the Supreme Court in

2   Firestone, a denial of benefits is reviewed de novo "unless the benefit plan gives the

3   administrator or fiduciary discretionary authority to determine eligibility or to construe the terms

4   of the plan." Id. at 115.

5        **2.**     To assess the applicable standard of review, the starting point is the wording of

6   the plan. Abatie, v. Alta Health & Life Ins. Co., 458 F.3d 955, 962-963 (9th Cir.2006).  "De novo

7   is the default standard of review.  Abatie, 458 F.3d at 963;  Bendixen v. Standard Ins. Co., 185

8   F.3d 939, 942 (9th Cir. 1999).  However, if the plan gives an administrator discretionary

9   authority, a court must apply the "abuse of discretion" or "arbitrary and capricious" standard of

10  review to its decision to deny benefits. Firestone, 489 U.S. at 111; Abatie, 458 F.3d at 963;

11  Bendixen, 185 F.3d at 942.

12       **3.**     In this action, the parties agree the Plan provides that the court's review is for an

13  abuse of discretion.

14       **4.**     Under abuse of discretion review, the court must affirm the decision to terminate

15  benefits if the decision was "based upon a reasonable interpretation of the plan's terms and made

16  in good faith." Bendixen v. Standard Life Ins. Co., 185 F.3d 939, 944 (9th Cir. 1999).  Under the

17  abuse of discretion standard, reversal of a plan administrator's determinations is appropriate if

18  they are arbitrary and capricious.  Jordan v. Northrop Grummon Corp. Welf. Benefit Plan, 370

19  F.3d 869, 875 (9th Cir. 2004); Schikore v. BankAmerica Supplemental Ret. Plan, 269 F.3d 956,

20  961 (9th Cir. 2001).   The court should not disturb the plan's decision unless the court finds its

21  factual findings were "clearly erroneous." Jordan, 370 F.3d at 875.   The court may "overturn a

22  decision only where it is so patently arbitrary and unreasonable as to lack foundation in factual

23  basis and/or authority in governing case or statute law."   Hensley v. Northwest Permanente P.C.

24  Ret. Plan & Trust, 258 F.3d 986, 1001 (9th Cir. 2001), *overruled on other grounds by* Abatie, 458

25  F.3d 955 (quotation and citation omitted).   "The mere fact that the plan administrator's decision

26  is directly contrary to some evidence in the record does not show that the decision is clearly

27

28                                                 20

erroneous." Snow v. Standard of Life Ins. Co., 87 F.3d 327, 331 (9th Cir. 1996).[2]  The clearly

erroneous standard "does not permit the overturning of a decision where there is substantial

evidence to support the decision, that is, where there is relevant evidence that reasonable minds

might accept as adequate to support a conclusion even if it is possible to draw two inconsistent

conclusions from the evidence."  Wells v. Reliance Standard Life Ins. Co., 285 Fed.Appx. 343,

344, 2008 WL 2622695 at *1 (9th Cir. 2008); Snow, 87 F.3d at 331.  An ERISA administrator

abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions

of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly

erroneous findings of fact." Wells, 285 Fed.Appx. at 344, 2008 WL 2622695, at * 1;  Boyd v.

Bert Bell/Pete Rozelle NFL Players Ret. Plan, 410 F.3d 1173, 1178 (9th Cir. 2005).   An "abuse

of discretion analysis allows a court to tailor its review to all the circumstances before it."

Abatie, 458 F.3d at 968.

     **5.**     When a plan has a conflict of interest, the court must take into account the nature

of the conflict when it reviews the discretionary acts of a trustee of a common-law trust.

Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct 2346, 2348 (2008).

     **6.**     The Supreme Court held that, as here, when the same entity determines eligibility

for benefits and pays those benefits out of its own pocket, a conflict of interest is created and a

reviewing court should consider that conflict as a factor in determining whether the plan

administrator has abused its discretion in denying benefits.  Glenn, 128 S.Ct. at 2346;  Saffon v.

Wells Fargo & Co. Long Term Disability Plan, 511 F.3d 1206, 1212 (9th Cir. 2008).

     **7.**     "Abuse of discretion review applies . . . even if the administrator has a conflict of

interest." Abatie, 458 F.3d at 965.   When a conflict exists, the district court must consider that

conflict in determining whether the plan administrator abused its discretion.  See Glenn, 128

S.Ct. at 2350-51; Saffon, 511 F.3d at 1211; Abatie, 458 F.3d at 967.  That is, the court "must

determine the extent to which the conflict influenced the administrator's decision and discount to

---

[2]Overruled on other grounds by Kearney v. Standard Ins. Co., 175 F.3d 1084 (9th Cir. 1999) (en banc).

that extent the deference [it] accord[s] the administrator's decision." Saffon, 511 F.3d at 1212. The Ninth Circuit has explained:

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

Abatie, 458 F.3d at 967-68 (citations omitted). Similarly, the Supreme Court has explained that reviewing courts must:

> take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion. . . . [C]onflicts are but one factor among many that a reviewing judge must take into account. . . . [T]he word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one. . . . In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

Glenn, 128 S.Ct. at 2350-51. These considerations aid the court in "making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." Saffon, 511 F.3d at 1212; Abatie, 458 F.3d at 969.

      **8.**     The general rule is that "when applying an abuse of discretion standard to an ERISA plan, the district court's review is limited to the administrative record." Burke v. Pitney

Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016, 1027-28 (9th Cir. 2008); Abatie, 458 F.3d at 970.   However, the court may consider evidence outside the administrative record "to decide the nature, extent and effect on the decision-making process of any conflict of interest " Nolan v. Heald College, 551 F.3d 1148, 1153 (9th Cir. 2009);   Burke, 544 F.3d 1028;   Abatie, 458 F.3d at 970.  "Similarly, the district court may consider evidence outside the administrative record if it determines that procedural irregularities prevented the full development of the administrative record."  Burke, 544 F.3d at 1028; Abatie, 458 F.3d at 970.  The court may recreate what the administrative record would have been had the procedure been correct.  Abatie, 458 F.3d at 972-73.

The Abatie court found as follows:

> When a plan administrator has failed to follow a procedural requirement of ERISA, the court may have to consider evidence outside the administrative record. For example, if the administrator did not provide a full and fair hearing, as required by ERISA, 29 U.S.C. § 1133(2), the court must be in a position to assess the effect of that failure and, before it can do so, must permit the participant to present additional evidence. We follow the Sixth Circuit in holding that, when an administrator has engaged in a procedural irregularity that has affected the administrative review, the district court should "reconsider [the denial of benefits] after [the plan participant] has been given the opportunity to submit additional evidence."
> As we noted earlier, if the plan administrator's procedural defalcations are flagrant, de novo review applies. And as we also noted, when de novo review applies, the court is not limited to the administrative record and may take additional evidence.
> Even when procedural irregularities are smaller, though, and abuse of discretion review applies, the court may take additional evidence when the irregularities have prevented full development of the administrative record. In that way the court may, in essence, recreate what the administrative record would have been had the procedure been correct.

Abatie,  458 F.3d at 973-73 (internal cites omitted).

**9.**     Because the Plan is funded through insurance policies issued by Unum and Unum administers the Plan, Unum labors under a structural conflict of interest.

**10.**     The court also finds a conflict because Unum did not thoroughly investigate the material aspects of Aluisi's job.  A conflict may be found where the administrator construes provisions of the plan in a way that conflicts with the plain language of the plan.  See Saffle, 85

F.3d at 458; Taft v. Equitable Life Assur. Soc., 9 F3d 1469, 1472 (9th Cir. 1993).  Unum relied on

a general description of Aluisi's job and then deemed his job  "Sedentary Work."   All further

reviews of Aluisi's file compared his job to "Sedentary Work" and not his actual job description.

While nothing in the Administrative Record negates the conclusion that Aluisi's job was in fact

"Sedentary" as defined by Unum, Unum's choice does indicate some conflict of interest.  See

Lasser v. Reliance Standard Ins. Co., 344 F.3d 381, 386 (3rd Cir. 2003) (finding that the term

"regular occupation" unambiguously meant the "usual work that the insured [was] actually

performing immediately before the onset of disability" and not a general occupation).   Unum's

definition of "Sedentary Work" focused on the ability to exert up to 10 pounds of force

occasionally and/or a negligible amount of force frequently to lift, carry, push, pull or otherwise

move objects, including the human body.    Sedentary work involves sitting most of the time, but

may involve walking or standing for brief periods of time.  By using the "Sedentary Work"

definition Unum appears to have applied unnecessary focus on Aluisi's ability to lift, carry, push,

pull or objects.  However, because this definition also considers the ability to sit for long periods

of time, any failure to carefully consider Aluisi's actual job requirements resulted in a minimal

conflict of interest.  Unum's categorization of Aluisi's job will be considered as a circumstance

when applying the abuse of discretion standard.

**11.**    Because of Unum's structural conflict of interest, the failure to fully determine the

material aspects of Aluisi's job, and Unum's documented history of biased claims handling, the

Court will view Unum's decision with a medium level of scepticism.

**B.  Discussion**

**12.**    The issue in this case is not whether this court believes Aluisi suffers from pain.

The issue is also not whether Unum believes Aluisi suffers pain.   Unum admits that Aluisi has

some level of pain, and the court finds Aluisi suffers from pain.   However, Unum's inability to

prove Aluisi is not in pain is not the issue in this action.

**13.**    In addition, the issue in this action is not whether this court would award Aluisi

1   disability benefits based on a de novo review of the file and other evidence of Aluisi's pain.

2   The *only* issue before the court is whether Unum's decision that Aluisi's pain did not prevent

3   him from working at his regular occupation was an abuse of Unum's discretion.

4       **14.**    The court finds that the Administrative Record reveals Unum's denials were

5   based on a complete review of the record.   Prior to granting benefits, Nurse Cross and Dr.

6   Gritton reviewed Dr. Javaid's and Dr. Azevedo's records.   Nurse Cross and other Unum officials

7   repeatedly requested additional information from Aluisi and Aluisi's doctors.   Dr. Randall spoke

8   with Dr. Azevedo about Aluisi's case.   In late 2002,  Nurse Orozco reviewed new records from

9   Dr. Azevedo, Dr. Javaid, and Dr. Rauf and asked Dr. Azevedo for more information.   Prior to

10  the final termination of benefits, Dr. Randall reviewed the entire file, including the medical

11  reports, surveillance, the responses of Dr. Rauf, Dr. Von Kanenel, and Dr. Javaid to the

12  surveillance, and Dr. Azevedo's medical records and response to the surveillance.   During

13  Aluisi's appeal, Nurse Sones reviewed additional medical records and Dr. Fluter reviewed the

14  entire file.   This is not like a case where administrators improperly relied on certain pieces of

15  evidence and not other evidence and fail to seek out additional information needed to make a

16  decision. See Saffon, 522 F.3d at 870-72.

17      **15.**    The court recognizes that Dr. Azevedo, the doctor who primarily treated Aluisi for

18  pain, found that the surveillance video and his own records supported a finding that Aluisi was

19  unable to work.   However, ERISA does not "impose a heightened burden of explanation on

20  administrators when they reject a treating physician's opinion," nor does it require that plan

21  decisionmakers "accord special deference to the opinions of treating physicians." Black &

22  Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003).   In addition, there is not a large

23  discrepancy between Dr. Azevedo's findings and Unum's medical consultants findings.   Dr.

24  Randall acknowledged Aluisi had back pain and Dr. Fluter opined that Aluisi was impaired.

25  The difference is only in the medical opinions about Aluisi's work capacity.   The court does not

26  find Unum abused its discretion in crediting the doctors and medical consultants who found work

27

28

capacity over Dr. Azevedo's opinions.

**16.**     Aluisi's initial claim was based on back pain that he claimed made him unable to sit, walk, or stand without pain.   Aluisi repeatedly claimed to his doctors, Unum representatives, and through his attorneys that the pain made it impossible for him to function.   Aluisi repeatedly stated that if he walked, sat, or stood for more than fifteen minutes the pain was "unbearable", he was "in agony" or in "a lot of pain."   See FF 24, 32, 38, 46, 47, 51, 54, & 58.

**17.**     Unum did not abuse its discretion in finding that the medical records and surveillance did not support the level of Aluisi's described pain.   Aluisi claimed the drive to Dr. Azevedo's office was over twenty minutes, but Dr. Azevedo noted on all but one visit that Aluisi was sitting comfortably.[3]   In addition, during the surveillance, Aluisi was seen driving a car for more than an hour; Aluisi was seen driving and sitting in a boat for more than an hour; and Aluisis was seen standing and walking.   Yet, the surveillance does not show Aluisi laying down to rest.   The inconsistencies between Aluisi's complaints of extreme pain and the observed activities support Unum's actions.

**18.**     While an independent medical evaluation ("IME") at times is helpful, an IME is not required by ERISA.  See  Fought v. Unum Life Ins. Co. Of America, 379 F.3d 997, 1015 (10th Cir. 2004).   In this case, the record demonstrates an IME was postponed in response to Aluisi's and Unum's agreement that Unum would first conduct a field visit.   In addition, it was not unreasonable for Unum to fail to conduct an IME when the surveillance tapes were compared with Aluisi's description of his symptoms.

**19.**     A court should look skeptically on denials that are offered for different reasons over time.  See Abatie, 458 F.3d at 974.   Here, Unum consistently took the position that the records provided did not support the disability claimed by Aluisi - chronic back pain that became excruciating if Aluisi sat, stood, or walked for more than approximately 15 minutes.

---

[3] The fact that on one occasion Dr. Azevedo noted Aluisi appeared to be in pain negates a finding that Dr. Azevedo automatically wrote a standard description of patients' present conditions in his records.  See FF 24A, (AR 298.)

**20.**     Courts often find an abuse of discretion when denials rely on selective evidence from the claim file or are based on an incomplete set of facts, where the administrator has not sought out additional information.  See Abatie, 458 F.3d at 974; Saffon, 522 F.3d at 873; Booton, 110 F.3d at 1463.   Here, no such flaws are apparent in this action.  Unum's denial notices to Aluisi were written in clear language and described the facts on which Unum had relied in denying his claim and their relationship to the relevant provisions of the policy.

**21.**     While Aluisi disagrees with the findings of medical professionals whom Aluisi saw and/or reviewed Aluisi's records, Unum's finding that Aluisi was not disabled is supported by evidence from the record.   Because the record demonstrates that there was a reasonable basis for concluding that Aluisi's medical condition was not disabling, the court must defer to the decision of the plan administrator.  See Jordan, 370 F.3d at 879.

**22.**     Based on all of the evidence, the court cannot conclude that Unum's denial of benefits was unreasonable.

**23.**     Because Unum did not abuse its discretion, Defendants are entitled to judgment in this case.

## ORDER

Accordingly, IT IS HEREBY ORDERED that the Clerk or the Court is DIRECTED to enter judgment in favor of Defendants and against Plaintiff and close this case.

IT IS SO ORDERED.

**Dated:   November 19, 2009**              **/s/ Anthony W. Ishii**
                                            CHIEF UNITED STATES DISTRICT JUDGE